UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                                      Case No. 11-57443

LIUDMILA A. STOROZHENKO,                                    Chapter 7

      Debtor.                                               Judge Thomas J. Tucker

_____/

K. JIN LIM, TRUSTEE,

      Plaintiff,

v.                                                          Adv. Pro. No. 11-6552

LIUDMILA A. STOROZHENKO,

      Defendant.
_____/

**TRIAL OPINION**

**I. Introduction**

    The Defendant in this adversary proceeding, Liudmila Storozhenko, filed a Chapter 7 bankruptcy case. In this adversary proceeding, the Plaintiff Chapter 7 Trustee, K. Jin Lim, seeks a judgment denying Defendant Debtor's discharge, based on 11 U.S.C. §§ 727(a)(2)(Count I of Plaintiff's Complaint); 727(a)(3)(Count II); and 727(a)(4)(A)(Count III).[1] The Court held a bench trial on April 3, 2012, then took the case under advisement.

    The Court has considered all of the evidence and arguments presented by the parties at trial. This opinion states the Court's findings of fact and conclusions of law.

    For the reasons stated below, the Court finds for Plaintiff Trustee on Counts II and III,

---

[1] At trial, Plaintiff abandoned the only other count in her complaint, Count IV.

and will enter a judgment denying Debtor's discharge, based on 11 U.S.C. §§ 727(a)(3) and 727(a)(4)(A).

**II. Jurisdiction**

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a)(E.D. Mich.). This is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

**III. Background and facts**

**A. The 2006 and 2009 divorce cases, and the civil contempt order against Debtor**

Most of the relevant facts in this case are undisputed.[2] The Debtor (sometimes referred to as "Liudmila" in this opinion) married Vladimir Nozhnik ("Vladimir") on July 16, 2008. Vladimir had recently divorced Esfir Nozhnik ("Esfir"), in April 2008. That divorce case had been filed in April 2006, in the Oakland County, Michigan Circuit Court (the "2006 Divorce Case"). Under the April 2, 2008 divorce judgment in that case, Vladimir was indebted to Esfir in the amount of approximately $120,000.00.[3] To collect that debt, the Oakland County Circuit Court appointed attorney David Findling as a receiver in the 2006 Divorce Case. Findling's duty as receiver was "to marshal, seize and preserve assets of [Vladimir] to satisfy his obligations to

---

[2] The facts stated in this opinion are established by the stipulations of the parties, contained in the Final Pretrial Order (Docket # 27) at 4-5; and by the testimony and exhibits presented at trial, including the June 22, 2011 Opinion and Order of the Oakland County Circuit Court in the 2009 divorce case between Vladimir and Liudmila. A copy of that Opinion and Order is Plaintiff's Exhibit 2. And some facts are established by the record in Liudmila's bankruptcy case (Case No. 11-57443), of which the Court takes judicial notice.

The trial exhibits are cited in this opinion as "PX-__" for Plaintiff's exhibits, and "DX-__" for Defendant's exhibits.

[3] PX-2 at 2. DX-D is a copy of the April 2, 2008 divorce judgment in the 2006 Divorce Case.

2

Esfir under the April 2, 2008 [divorce judgment]."[4]

Liudmila's marriage to Vladimir did not last long. They separated on August 6, 2009, after slightly more than a year of marriage. Liudmila filed a complaint for divorce against Vladimir on August 18, 2009, in the case captioned *Liudmila Storozhenko v. Vladimir Nozhnik*, Oakland County Circuit Court case number 2009-762704 DO (the "2009 Divorce Case").[5] On August 19, 2009, at Liudmila's request, the Circuit Court in the 2009 Divorce Case entered a "mutual property injunction," which prohibited both Liudmila and Vladimir from "selling, assigning, encumbering, or otherwise disposing of" any assets, "except as is needed in the ordinary course of living."[6]

On October 30, 2009, during a pretrial hearing in the 2009 Divorce Case, Vladimir testified that he had transferred $105,000 into bank accounts in Liudmila's name, in order to conceal the money from Esfir and the Receiver. Liudmila, in turn, testified in that same hearing that she knew that Vladimir was hiding that money from someone, and that she had spent about $50,000 of that money.[7]

Shortly after these revelations, on November 2, 2009, the Oakland County Circuit Court appointed David Findling as a receiver in the 2009 Divorce Case, for the same purposes as in the 2006 Divorce Case — namely, to marshal, seize and preserve assets of Vladimir in order to satisfy Vladimir's obligations to Esfir arising from the April 2, 2008 divorce judgment that had

---

[4] PX-2 at 2, 9.

[5] *Id.* at 2.

[6] *Id.* at 2, 6.

[7] *Id.* at 2-3, 6.

3

been entered in the 2006 Divorce Case.[8]

In November 2009, in the 2009 Divorce Case, Findling filed a motion to hold Liudmila in contempt, for allegedly violating the mutual property injunction in that case. The Circuit Court ultimately held an evidentiary hearing on May 2, 2011, and on June 22, 2011, that court issued an "Opinion and Order" finding Liudmila in civil contempt.[9]

In its Opinion and Order, the Circuit Court found that Liudmila violated the mutual property injunction during the weeks after it was entered, by transferring or spending $106,144.73 in excess of what "was needed in the ordinary course of living." The Circuit Court ordered Liudmila to pay that amount to Findling, Receiver within 30 days. The court indicated that it might fine or incarcerate Liudmila if she did not comply with the order.[10]

The day after the Circuit Court entered its Opinion and Order, Liudmila filed her Chapter 7 bankruptcy case in this Court.

**B. Debtor's pre-petition personal injury settlement**

Meanwhile, in March 2011, while the contempt proceedings were pending against her in the 2009 Divorce Case, and some three months before she filed bankruptcy, Liudmila settled a personal injury claim that she had been pursuing, with the assistance of counsel. After payment

---

[8] *Id.* at 3, 9.

[9] *Id.* at 3-4, 8-9. The evidence at trial indicated that Liudmila voluntarily dismissed the 2009 Divorce Case at some point before the May 2, 2011 contempt hearing was held in that case. But the contempt proceeding in the 2009 Divorce Case continued unabated after the dismissal. Sometime in 2010, Vladimir filed a new divorce proceeding against Liudmila, Case No. 2010-769863-DO (Oakland County Circuit Court). In that case, the Circuit Court entered a Judgment of Divorce on October 20, 2010, after holding a hearing on September 30, 2010. *See* DX-B; DX-E. By that judgment, Vladimir and Liudmila were divorced.

[10] PX-2 at 7-9.

of attorney fees and expenses, Liudmila received a total of $46,862.08 from the settlement. She received this sum in the form of two checks from her attorney: (1) a check dated March 31, 2011 for $44,206.56; and (2) a check dated April 21, 2011 for $2,655.52.[11]

### C. Debtor's failure to fully account for the settlement proceeds, and her failure to disclose $5,470.00 in cash settlement proceeds in her original Schedule B

Liudmila testified at trial that she spent most of her $46,862.08 in settlement money before she filed bankruptcy. She testified that on May 8, 2011, she flew to Russia to visit her mother, who was having serious health problems.[12] Liudmila testified that she took about $40,000 of the settlement money with her on this trip, and that she spent all but $5,000 to $7,000 of this money while in Russia. She further testified that she spent the money in Russia to pay for various services for her ailing mother, including medical and nursing services; a home health aide; and massage services.

This spending by Liudmila may have violated an order of the Oakland County Circuit Court. The parties have stipulated that in one of the divorce cases — which one is not clear — "[o]n March 2, 2011, the Oakland County Circuit Court entered a preliminary injunction prohibiting Debtor from engaging in any transfer in excess of $3,000.00."[13]

By no later than June 23, 2011, Debtor had returned from Russia to the Detroit area. That is the day she signed and filed her bankruptcy petition.[14] Although Liudmila testified that she

---

[11] PX-3 and PX-4.

[12] *See generally* DX-A (excerpt from medical records, recounting various medical problems). A death certificate that was admitted into evidence at trial indicates that Liudmila's mother later died, in Volzhsky, The Volgograd Region, Russia, on November 22, 2011, at the age of 89.

[13] Final Pretrial Order (Docket # 27) at 4.

[14] PX-1 at 2.

returned from Russia with $5,000 to $7,000 of the settlement money, her bankruptcy schedules filed on July 7, 2011 stated that she had considerably less than this amount as of the June 23, 2011 petition date. In Debtor's Schedule B, Debtor declared under penalty of perjury that she had the following money on the petition date: $30.00 of cash on hand; and an interest in three financial accounts valued at a total of $3,210.00. Of this amount, $3,159.00 was in an "iGObanking" account.[15]

Liudmila later filed an amended Schedule B, on August 5, 2011, to increase the "cash on hand" amount as of the petition date from $30.00 to $5,500.00. This was in addition to the interest in the three financial accounts totaling $3,210.00 that she had listed in her original Schedule B.[16]

Liudmila apparently does not speak English well. She testified at trial through an interpreter, her son-in-law, Daniel Rappaport. But Liudmila testified that when she signed her original bankruptcy petition and papers, she understood them. She does not claim, for example, that she did not understand what her original Schedule B said. She also testified that her original bankruptcy papers were accurate and complete. But as to this last point, (1) this is belied by Liudmila's having later filed her *amended* Schedule B; and (2) this cannot be true, unless Liudmila's amended Schedule B is not accurate.

The evidence at trial demonstrates that despite the Plaintiff Trustee's repeated requests that Liudmila give a full accounting and supporting documentation, Liudmila has produced no documentation to prove what became of her $46,862.08 in pre-bankruptcy settlement proceeds,

---

[15] PX-1 at 3 (Schedule B filed July 7, 2011), items 1 and 2.

[16] PX-1 at 5.

6

*except* $2,100.00 that she paid in fees at a check-cashing service. Liudmila's only documentation regarding what happened to the settlement proceeds does not show *anything* about where or how the rest of the money was ultimately spent, or even that any of it was spent. Liudmila's only documentation is the following:

> (1) a series of 12 receipts for Western Union money orders in the amount of $1,000 each, plus one Western Union money order receipt in the amount of $206.56, all dated May 3, 2011; and all payable in blank;[17]
>
> and
>
> (2) receipts from a check cashing service ("Checksmart 239" in Livonia, Michigan) showing that on April 29, 2011 Liudmila cashed the $2,655.52 settlement check and out of the proceeds of that check paid a $100.00 fee, bought a $420.00 money order, and received the $2,135.52 balance in cash; the payee on the $420.00 money order is unknown; and no receipt for that money order has been produced;[18]
>
> and
>
> (3) receipts from the same check cashing service, showing that on May 3, 2011 Liudmila cashed the $44,206.56 settlement check and out of the proceeds of that check paid a $2,000.00 fee, bought the 13 money orders referred to in item 1 above (which were payable in blank and which total $12,206.56,) and received the $30,000 balance in cash.[19]

From this very sparse documentation, we know only that of the $46,862.08 in settlement proceeds, Liudmila spent $2,100.00 on check-cashing and money-order fees; converted $12,626.56 into money orders payable in blank; and got cash totaling $32,135.52. Liudmila's documentation, therefore, leaves $44,762.08 (*i.e.*, $46,862.08 minus $2,100.00) of the settlement proceeds unaccounted for. If Liudmila's *amended* Schedule B is to be believed, she had

---

[17] PX-5.

[18] PX-4.

[19] PX-7.

$5,500.00 of those proceeds left as of the petition date, so that would still leave $39,262.09 unaccounted for. Liudmila's very limited documentation does not show that she actually ever spent any, or all, of this $39,262.09 in settlement proceeds — *i.e.*, that she does not still have some or all of that money, which would be an undisclosed asset of the bankruptcy estate. Nor does her documentation show that to the extent she *did* spend these settlement proceeds, what she spent those proceeds for, who they were paid to, or when they were paid.

Liudmila's testimony, which is her word without any corroborating proof, is that she spent roughly $33,000 to $35,000 of this settlement money in Russia, for the care of her mother, all in the form of cash payments, and all without obtaining a single receipt.[20] Liudmila testified at trial that in Russia it is not customary to get receipts when paying people money, and that in Russia people "like to work for cash." But Liudmila did not testify, or offer any form of proof, that she ever asked anyone for a receipt for any of the money she spent in Russia, or that she could not have obtained receipts if she had tried to do so.

## IV. Discussion

The Trustee alleges, among other things, that Liudmila made a false oath in her original Schedule B, by failing to disclose $5,470.00 of the cash settlement proceeds that she later disclosed in her amended Schedule B. And the Trustee alleges that, without adequate

---

[20] In addition to the Debtor's trial testimony, the parties have stipulated that in a Fed.R.Bankr.P. 2004 examination on August 30, 2011,

> Debtor stated that she had taken the money to Russia to care for her ill mother. **Debtor has stated that she cannot produce receipts because her mother was not admitted to a hospital.**

Final Pretrial Order (Docket # 27) at 4-5 (emphasis added).

8

justification, Liudmila has failed to keep or preserve recorded information from which her spending of the $46,862.08 settlement proceeds can be ascertained. For these reasons, the Trustee argues that the Court should deny Liudmila's discharge, under Bankruptcy Code §§ 727(a)(4)(A) and 727(a)(3), respectively.[21] The Court will consider these arguments, in reverse order.

**A. Section 727(a)(3)(failure to keep recorded information without justification)**

This Court has discussed § 727(a)(3) in a prior opinion, as follows:

> Bankruptcy Code § 727(a)(3) provides:
>
>> The court shall grant the debtor a discharge, unless . . . the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]
>
> 11 U.S.C. § 727(a)(3). To carry its initial burden, a party seeking denial of a debtor's discharge under § 727(a)(3) must present evidence that shows:
>
>> (1) either that the debtor failed to keep or preserve any recorded information, including books, documents, records and papers, or that the debtor or someone acting for him destroyed, mutilated, falsified, or concealed any recorded information including books, documents, records and papers; and (2) that as a result, it is impossible to ascertain the financial condition and material business

---

[21] The Trustee also argues that Liudmila should be denied a discharge under 11 U.S.C. § 727(a)(2), for having transferred or concealed some of the settlement proceeds, within one year before filing her bankruptcy petition, and/or after filing her bankruptcy petition, "with intent to hinder, delay, or defraud a creditor or an officer of the estate." Because the Court finds for the Trustee on his two other theories, however, it unnecessary to discuss the § 727(a)(2) theory.

>
> transactions of the debtor.
>
>> [*Solomon v. Barman (In re Barman)*, 244 B.R. 896, 900 (Bankr. E.D. Mich. 2000)] (citation omitted). Once the plaintiff has established that the debtor's records are inadequate, the burden shifts to the debtor to prove some justification for his failure to have adequate records. *Id*.

*Comerica Bank v. Bressler* (*In re Bressler*), 321 B.R. 412, 419 (Bankr. E.D. Mich. 2005).

In this case, the Trustee has met his initial burden of proof under § 727(a)(3). Based on the facts and evidence outlined in Part III-B and III-C of this opinion, the Court finds that the Trustee has proven, by a preponderance of the evidence, that the debtor Liudmila Storozhenko failed to keep or preserve *any* recorded information regarding how she allegedly spent at least $39,262.09 of the $46,862.08 in settlement proceeds that she received within the three months before she filed bankruptcy. Liudmila has no documentation to show that in fact she actually spent any of this money, rather than still having it and continuing to conceal it from the Trustee, her creditors, and the Court. Similarly, Liudmila has no documentation to show how she spent this money, who she paid money to, when she paid it, or what she paid it for. All we have is Liudmila's testimony, which is not only uncorroborated, but also lacking in detail.

The Trustee also has proven, by a preponderance of the evidence, that because of Liudmila's lack of records, "it is impossible to ascertain the financial condition and material business transactions of the debtor," within the meaning of 11 U.S.C. § 727(a)(3).

The burden therefore shifts to Liudmila, "to prove some justification for [her] failure to have adequate records" regarding the disposition of the settlement proceeds. *See Comerica Bank v. Bressler,* 321 B.R. at 419. Liudmila has failed to meet that burden. Liudmila testified that she spent roughly $33,000 to $35,000 of the settlement money in Russia, during the month or so

10

before she filed bankruptcy, for the care of her ailing mother, all in the form of cash payments. But Liudmila admitted that she did not obtain any receipts for any of this spending. As noted above, Liudmila testified at trial that in Russia it is not customary to get receipts when paying people money, and that in Russia people "like to work for cash." But the Court finds that this testimony, even if credited, does not establish an adequate justification for Liudmila's failure to get any receipts or to make any written record of her spending in Russia. And Liudmila did not testify, or offer any form of proof, that she ever asked anyone for a receipt for any of the money she spent in Russia, or that she could not have obtained receipts if she had tried to do so. She has utterly failed to meet her burden of proving a justification for her lack of records.

For these reasons, the Court finds for the Trustee, and will deny Liudmila's discharge under § 727(a)(3).

### B. Section 727(a)(4)(A)(false oath)

The Court also finds for the Trustee on his claim that Liudmila should be denied a discharge under § 727(a)(4)(A). The Trustee has proven all the elements for such relief, based on Liudmila's having made a false oath in her original Schedule B, by failing to disclose the $5,470.00 in cash settlement proceeds that she later disclosed in her amended Schedule B.

The United States Court of Appeals for the Sixth Circuit has discussed the elements of § 727(a)(4)(A) as follows:

> [Under] section 727(a)(4)(A)[:]
>
> (a) The court shall grant the debtor a discharge, unless—
> . . . .
> (4) the debtor knowingly and fraudulently, in or in connection with the case—

> (A) made a false oath or account[.]
>
> In order to deny a debtor discharge under this section, a plaintiff must prove by a preponderance of the evidence that: 1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case.

*Keeney v. Smith* (*In re Keeney*), 227 F.3d 679, 685 (6th Cir. 2000)(citations omitted). As for the fourth of these elements, *i.e.*, the intent element:

> "'Complete financial disclosure'" is a prerequisite to the privilege of discharge. . . . [I]ntent to defraud "involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression." A reckless disregard as to whether a representation is true will also satisfy the intent requirement. "'[C]ourts may deduce fraudulent intent from all the facts and circumstances of a case. However, a debtor is entitled to discharge if false information is the result of mistake or inadvertence.

*Id.* at 685-86 (citations omitted). As for the fifth element, materiality,

> The subject of a false oath is material if it "'bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.'"

*Id.* at 686 (citations omitted).

In this case, it is undisputed that the first two elements under § 727(a)(4)(A) are established. First, Liudmila's statement in her original Schedule B was made under oath. Statements made under penalty of perjury, as Liudmila's Schedule B was, are considered to be under oath for purposes of § 727(a)(4)(A). *See, e.g., Keeney v. Smith*, 227 F.3d at 686 (affirming denial of a debtor's discharge based on a "false oath" theory under § 727(a)(4)(A), because the debtor failed to disclose his interest in certain properties in his bankruptcy schedules); *see*

12

*generally* 28 U.S.C. § 1746. Second, Liudmila's statement in her original Schedule B that she had $30.00 of cash on hand on the petition date, rather than $5,500.00, and this failure to disclose $5,470.00 of the cash settlement proceeds, was "false," in that it was *incorrect*. The Debtor's filing of her amended Schedule B, in which she disclosed the additional $5,470.00 in cash for the first time, was tantamount to an admission by Liudmila of the falsity of her original Schedule B.

With respect to the fifth element, the Court finds that the false statement in Liudmila's original Schedule B "related materially to the bankruptcy case," because it clearly "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Keeney v. Smith,* 227 F.3d at 685. Liudmila does not dispute this element.

Liudmila does dispute the third and fourth elements of the Trustee's "false oath" claim, namely the elements that "the debtor knew the statement was false;" and that "the debtor made the statement with fraudulent intent." *Id.* But the Court finds, from "all the facts and circumstances" of this case, that Liudmila *did* know, when she made the false statement in her original Schedule B, that it was false. And she knowingly made this false statement with fraudulent intent. The false statement was not a mere mistake or inadvertent error.

The evidence is discussed in detail in Part III of this opinion. Liudmila may have filed her bankruptcy petition in haste, on June 23, 2011, because just the day before that she had been found in civil contempt by the Oakland County Circuit Court, and ordered to pay David Findling, Receiver, the sum of $106,144.73 within 30 days. But Liudmila did *not* file her original Schedule B in haste. She did not sign and file that Schedule B until 14 days after filing her bankruptcy petition, on July 7, 2011. So she had ample time, and the benefit of competent

13

bankruptcy counsel, to prepare and review her schedules and to make sure they were accurate.

When Liudmila signed her original Schedule B and filed it, both on July 7, 2011, she had, according to her testimony, recently returned from Russia with $5,000 to $7,000 of the settlement proceeds, in cash. According to her *amended* Schedule B, which she later filed on August 5, 2011, the amount of "cash on hand" that she had as of the June 23, 2011 petition date was $5,500.00, not the paltry $30.00 she had stated in her original Schedule B. (This was in addition to her interest in the three financial accounts totaling $3,210.00 that she had listed in both her original and amended Schedules B.) Liudmila did not testify, or present any evidence, that she had somehow simply forgotten about having a sum of cash as large as $5,500.00 when she signed and filed her original Schedule B. And the Court would find any such assertion to be unbelievable.

Liudmila made no claim at trial that she misunderstood her Schedule B when she signed it and filed it. If anything, she testified just the opposite — *i.e.*, she testified that when she filed her original bankruptcy petition and papers, she understood them.

One might argue, though Liudmila did not do so at trial, that Liudmila had no motive for intentionally concealing $5,470.00 of her settlement cash in her original Schedule B. This is so, one might argue, because when Liudmila did disclose the full $5,500.00 in cash in her amended Schedule B, she was able to claim all of it as exempt on her amended Schedule C, under 11 U.S.C. § 522(d)(5).[22] But there is no evidence that Liudmila was aware that she could exempt the $5,500.00 in cash when she omitted it from her original Schedule B.

---

[22] *See* amended Schedules B and C, filed in Case No. 11-57443 on August 5, 2011 (Docket # 24.)

14

11-06552-tjt    Doc 30    Filed 07/06/12    Entered 07/06/12 12:42:33    Page 14 of 16

Liudmila has not explained why she kept this much money in the form of cash after she returned from Russia. She had three bank accounts when she filed her bankruptcy case, according to her Schedule B. She could have easily put the cash in one of those accounts. Instead, she decided to keep it in the form of cash. This circumstance itself is suspicious; with no explanation offered for keeping this much money in the form of cash after she returned from Russia, this suggests that Liudmila wanted to keep this money hidden from, and out of the reach of, her creditors and the bankruptcy trustee.

Moreover, the Court cannot credit any claim of innocent intentions in Liudmila's testimony; the Court finds that she is not credible. As discussed in Part III of this opinion, Liudmila has a pre-bankruptcy history of concealing assets from creditors, and of concealing and spending money in a way that violates court orders. As noted above, during a pretrial hearing in Liudmila's 2009 Divorce Case, her then-husband Vladimir testified that he had transferred $105,000 into bank accounts in Liudmila's name, in order to conceal the money from Vladmir's creditors (his ex-wife Esfir and the court-appointed Receiver David Findling.) Liudmila, in turn, admitted that she participated in and benefitted from Vladimir's scheme — she testified in that same hearing that she knew that Vladimir was hiding that money from someone, *and* that she had spent about $50,000 of that money.

On the day before she filed her bankruptcy case, Liudmila was found by the Oakland County Circuit Court to have violated an injunction that she had agreed to in the 2009 Divorce Case, during the weeks after it was entered, by transferring or spending $106,144.73 in excess of what "was needed in the ordinary course of living."

Finally, Liudmila knew when she filed her bankruptcy case that she had just been ordered

by the Oakland County Circuit Court to pay David Findling, Receiver, the sum of $106,144.73 within 30 days, or face possible fines or incarceration.

Thus, Luidmila has a rather striking history of knowingly concealing money from creditors, and spending money for her own benefit, in violation of state court orders and to the detriment of creditors. Against this background, and under all the circumstances, the Court finds that Liudmila's action in omitting the $5,470.00 in cash from her original Schedule B was done knowingly, and with a fraudulent intent to conceal that money from the bankruptcy trustee, her creditors, and this Court.

For these reasons, the Court finds for the Trustee, and will deny Liudmila's discharge under § 727(a)(4)(A).

**V. Conclusion**

Based on the findings of fact, conclusions of law, and the reasons stated in this opinion, the Court will enter judgment for Plaintiff Trustee on Counts II and III of the Complaint, and will enter a judgment denying Debtor's discharge, based on 11 U.S.C. §§ 727(a)(3) and 727(a)(4)(A). The Court will dismiss Count I, without prejudice, as moot, and will dismiss Count IV (the abandoned count) with prejudice.

**Signed on July 6, 2012**　　　　　　　　　　　　　**/s/ Thomas J. Tucker**
　　　　　　　　　　　　　　　　　　　　　　　　　　**Thomas J. Tucker**
　　　　　　　　　　　　　　　　　　　　　　　　　　**United States Bankruptcy Judge**

16

11-06552-tjt    Doc 30    Filed 07/06/12    Entered 07/06/12 12:42:33    Page 16 of 16